PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BIANCA GARCIA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

THE SAVINGS BANK MUTUAL LIFE INSURANCE COMPANY OF MASSACHUSETTS, a Massachusetts insurance company, d/b/a WWW.SBLI.COM,

Defendant.

Case No.: 2:26-cv-07036-MWC-RAO

**SECOND AMENDED CLASS ACTION COMPLAINT FOR UNLAWFUL SPAMMING AND INVASION OF PRIVACY**

Plaintiff Bianca Garcia ("Plaintiff") alleges as follows:

## I. NATURE OF ACTION

1. This action concerns two related, but legally distinct courses of conduct by Defendant The Savings Bank Mutual Life Insurance Company of Massachusetts ("SBLI"). First, SBLI used a performance-marketing program to advertise its life-insurance products in a commercial email delivered to Plaintiff in California. Second, when that advertising succeeded and Plaintiff arrived at SBLI.com, SBLI's own website immediately initiated a separate series of electronic contacts with Plaintiff's California device, including geolocation, device identification, cookie placement, cross-site identity synchronization, behavioral analytics, and session recording through numerous advertising-technology and data-broker integrations.

2. The Court's September 10, 2026 Order entered in the instant action dismissed the First Amended Complaint for lack of personal jurisdiction because the prior record did not adequately connect the particular email transmission to an intentional act by SBLI, did not adduce evidence that SBLI itself knew Plaintiff was in California when the challenged conduct occurred, and did not establish a right of control over the third-party marketer. This Second Amended Complaint addresses each point directly and, critically, separates the jurisdictional contacts supporting the email claim from SBLI's own independent website conduct supporting the privacy claims. (*See* Order Granting Def.'s Mot. to Dismiss FAC at 8–11; *Garcia v. The Sav. Bank Mut. Life Ins. Co. of Mass.*, No. 2:26-cv-07036-MWC-RAO, ECF No. 29 (C.D. Cal. Sept. 10, 2026).

3. The new jurisdictional allegations are grounded in SBLI's own admissions, public regulatory records, SBLI's own privacy disclosures, and a technical examination of SBLI.com. SBLI's Senior Vice President for Direct/Digital Sales and Marketing admitted that SBLI assigned Madrivo Media LLC an exclusive SBLI "Campaign Code" for SBLI email marketing; the URL in Plaintiff's email contained that SBLI Campaign Code; and SBLI maintains an email-marketing tracking system in which campaign and

click identifiers are recorded. (Decl. of Paul J. Pennelli ¶¶ 3–9, *Garcia v. The Sav. Bank Mut. Life Ins. Co. of Mass.*, No. 2:26-cv-07036-MWC-RAO, ECF No. 13-2 (C.D. Cal. filed July 28, 2026) ("Pennelli Decl.").) Those admissions establish a concrete, SBLI-created commercial pathway linking the advertisement to SBLI's own performance-marketing infrastructure even though SBLI disputes who generated the particular Click-Key.

4. SBLI's own Online Privacy Policy supplies the location-knowledge allegation that the prior record lacked. SBLI publicly states that when a consumer visits SBLI's online platform, opens SBLI emails, or interacts with SBLI digital advertisements, SBLI may collect the consumer's IP address and "non-precise geographic location" derived from that IP address or other device information; SBLI further states that it tracks interactions with its platform, emails, and digital advertisements and uses that information to analyze browsing patterns, preferences, and demographics. SBLI, Online Privacy Policy, https://www.sbli.com/privacy-policy/ (last visited Sept. 11, 2026).

5. The technical evidence is even more concrete. A forensic examination of SBLI.com observed third-party requests executing immediately upon page load, before a first-time visitor was given an effective opportunity to grant or deny consent. Those requests included integrations with AdRoll/NextRoll, Eyeota, OpenX, BidSwitch, LiveRamp, Tapad, PubMatic, StackAdapt, TripleLift, Magnite, Bombora, Outbrain, HubSpot, Snapchat, The Trade Desk, Xandr, Microsoft Advertising/Bing, Microsoft Clarity, LinkedIn, Index Exchange, and AdsWizz. The observed integrations transmitted IP-derived location information, unique identifiers, device information, browsing and behavioral information, referrer information, and persistent cookies to third parties for advertising, identity resolution, audience building, attribution, and cross-site or cross-device tracking.

6. Among other things, the technical examination observed: Xandr receiving an X-Proxy-Origin header preserving the visitor's originating IP address and therefore

geographic region; PubMatic and StackAdapt integrations expressly associated with geolocation; LiveRamp identity-sync requests using persistent identifiers to connect online and offline profiles; Microsoft/Bing assigning a persistent MUID identifier; Microsoft Clarity recording page views, clicks, scrolling and session behavior while synchronizing with Microsoft advertising identifiers; Snapchat receiving persistent visitor and correlation identifiers; and AdRoll cookies persisting for approximately 395 days. These are not allegations that a passive website happened to be viewable in California. They describe deliberate software processes selected and deployed on SBLI's website to identify, classify, remember, analyze, and monetize the device that contacted SBLI.

7. The Ninth Circuit's en banc decision in *Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025) (en banc), governs that conduct. *Briskin* holds that electronic entry into California to obtain personal information is a relevant forum contact; that express aiming does not require a "forum-specific focus" about California only or "differential targeting" or "differential treatment" of the forum state; and that a nationwide interactive platform expressly aims wrongful conduct at a forum when its forum contacts are its own deliberate choice rather than random, isolated, or fortuitous. *Id.* at 755–60. The Ninth Circuit expressly overruled *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201 (9th Cir. 2020), and any other cases requiring a "forum-specific focus" or "differential targeting" or differential treatment of the forum state. *Briskin*, 135 F.4th at 757–58.

8. *Briskin* is especially close here because the Ninth Circuit did not require the defendant to know the consumer's location before the very first byte of software touched the device. It held sufficient that Shopify allegedly knew the consumer's location "either prior to ***or shortly after*** installing its initial tracking software" and then continued extracting, maintaining, and commercially exploiting the consumer's information. *Id.* at 756 & n.13 (emphasis added). SBLI's own policy admits collection of IP-derived location data when consumers interact with its website, emails, and digital

advertisements, and the spyware evidence shows that SBLI's chosen ad-tech stack immediately geolocates and identifies visitors and then continues a cascade of tracking, cookie syncing, fingerprinting, and behavioral surveillance. Under *Briskin*, that is defendant-created, forum-directed conduct.

9. Plaintiff no longer asserts a claim under section 638.51 of the California Penal Code. Plaintiff notes, however, the California Court of Appeal's August 21, 2026 tentative ruling in *Variety Media, LLC v. Superior Court*, No. B350578, Tentative Ruling at 1–3 (Cal. Ct. App. Aug. 21, 2026). Although tentative and nonprecedential, the California Court of Appeal in *Variety* tentatively rejected the categorical argument that CIPA's pen-register provisions are limited to telephone communications, while identifying a narrower question concerning the kind and direction of metadata captured by the particular technology alleged there. *Id.* at 1–3. Section 631(a) of the California Penal Code presents a different statutory inquiry: whether an independent third party contemporaneously reads, learns, acquires, or receives the contents or meaning of a communication without prior consent, and whether the website operator intentionally aids or enables that interception. *Variety* does not decide that question. Plaintiff, therefore, pleads the section 631(a) theory supported by the actual content-bearing transmissions documented on SBLI.com, rather than asking this Court to resolve the distinct section 638.51 issue now pending in *Variety*.

10. The claims are, therefore, not jurisdictionally fungible. Count One arises from SBLI's own participation in and economic use of an email-marketing campaign for which SBLI assigned an exclusive campaign code and maintained attribution infrastructure. Counts Two and Three arise from what SBLI itself caused its own website to do after Plaintiff arrived: electronic entry into a California device, contemporaneous duplication and transmission of content-bearing browser communications to independent third parties, placement and reading of persistent identifiers, geolocation, session recording, cross-site identity synchronization, and transmission of page, referrer, navigation, behavioral, and event data to advertising and

data-broker partners. Even if the Court were ultimately to conclude after discovery that the sender of the first-hop email acted outside SBLI's authority, that would not erase SBLI's own subsequent tortious contacts with California supporting the privacy claims.

## II. PARTIES, SUBJECT-MATTER JURISDICTION, PERSONAL JURISDICTION, AND VENUE

11. Plaintiff Bianca Garcia is a citizen and resident of California and owns the email address to which the challenged commercial email was delivered. At all relevant times, Plaintiff was physically present in California when she received and opened the email, clicked the advertising link, and interacted with SBLI.com.

12. Defendant The Savings Bank Mutual Life Insurance Company of Massachusetts is a Massachusetts insurance company doing business as SBLI and through SBLI.com. SBLI is incorporated in Massachusetts and maintains its principal place of business in Massachusetts. Plaintiff does not allege general jurisdiction over SBLI in California. Personal jurisdiction is specific and claim-linked.

13. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed class exceeds 100 members, minimal diversity exists, and the aggregate amount in controversy exceeds $5 million. SBLI itself removed this action to federal court on that basis. (Notice of Removal ¶ 6; ECF #1.)

14. California's long-arm statute extends personal jurisdiction to the limits permitted by due process. (Cal. Civ. Proc. Code § 410.10.) Specific jurisdiction exists where (1) the defendant purposefully directs activity at the forum or purposefully avails itself of the forum; (2) the claim arises out of or relates to the defendant's forum contacts; and (3) jurisdiction is reasonable. *Briskin*, 135 F.4th at 750–52; *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359–65 (2021). Because the claims sound in tort, purposeful direction is assessed under *Calder v. Jones*, 465 U.S. 783 (1984).

**A. <u>SBLI Deliberately Conducts and Regulates Insurance Business in California.</u>**

15. SBLI has been authorized by the California Department of Insurance to transact life and disability insurance in California since July 19, 2006. Its California Company ID is 4974-2, its NAIC number is 70435, and its license status is "Unlimited-Normal." California Department of Insurance, Company Profile: The Savings Bank Mutual Life Insurance Company of Massachusetts (NAIC No. 70435; Cal. Co. ID No. 4974-2), https://interactive.web.insurance.ca.gov/companyprofile/companyprofile?doFunction=getCompanyProfile&eid=105135 (last visited Sept. 11, 2026).

16. The same California Department of Insurance record identifies a California agent for service of process in San Francisco and confirms that SBLI is authorized to transact LIFE and DISABILITY lines in this State. *Id.* These facts are not asserted as a substitute for claim-specific contacts; they show that California is a known, deliberately served market in the geographic scope of SBLI's commercial ambitions, a factor *Briskin* recognizes as relevant to express aiming. 135 F.4th at 757–58 (discussing *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229–31 (9th Cir. 2011)).

17. SBLI's own public website solicits consumers to obtain term-life-insurance quotes online, invites consumers to enter identifying and contact information including ZIP code, and represents that SBLI or its agents may contact them concerning insurance products or services. SBLI, Affordable Life Insurance: Secure Your Future, https://www.sbli.com/affordable-life-insurance-secure-your-future/ (last visited Sept. 11, 2026). California residents are not accidental visitors to a passive informational page; California is a market SBLI has affirmatively entered, licensed itself to serve, and built compliance and privacy infrastructure to recognize.

18. SBLI's website also contains California-specific privacy content. SBLI's Online Privacy Policy directs California residents to a California Consumer Privacy Act Notice and to an "Important Privacy Choice for California Consumers." SBLI, Online Privacy Policy, *supra*. Again, Plaintiff does not contend that a California privacy notice

alone creates jurisdiction. The significance is cumulative: SBLI knows it has California users, identifies them as California residents, applies California-specific rules to their data, and operates technical systems that can learn their location while they interact with SBLI's website, emails, and digital advertisements.

**B. SBLI's Own Admissions Connect the Challenged Email to an SBLI-Created Performance-Marketing Campaign.**

19. The challenged email advertised SBLI term-life insurance, displayed the SBLI name and branding, invited the recipient to "Check My Rate Now," and routed the recipient to SBLI's own website. It was, therefore, a commercial email advertisement in which SBLI advertised its own product, regardless of which human or intermediary physically transmitted the SMTP message. *See* Cal. Bus. & Prof. Code § 17529.5(a); *Hypertouch, Inc. v. ValueClick, Inc.*, 192 Cal. App. 4th 805, 820–21 (2011) (section 17529.5 applies broadly to an entity that advertises in deceptive commercial email and is not limited to the entity that physically sends or initiates it); *Greenberg v. Digital Media Sols., LLC*, 65 Cal. App. 5th 909, 925–30 (2021) (advertiser may face section 17529.5 liability for deceptive identifying information used by third-party marketing partners).

20. SBLI's own declarant admitted that Madrivo is a digital marketing service that assists SBLI in email-marketing campaigns, that SBLI assigned Madrivo an exclusive SBLI Campaign Code for Madrivo's sole use in SBLI marketing emails, and that the URL contained in Plaintiff's email carried that exclusive SBLI Campaign Code. (Pennelli Decl. ¶¶ 3–5.) This is direct evidence of a defendant-created commercial relationship and a defendant-created identifier embedded in the very click path used to deliver Plaintiff to SBLI.

21. SBLI's declarant further admitted that the email URL contained a "Click-Key" and that SBLI maintains an email-marketing tracking system in which such identifiers can be investigated. (*Id.* ¶¶ 7–9.) SBLI contends that this particular Click-Key did not exist in its system and, therefore, infers the email was not approved by

SBLI or Madrivo. (*Id.* ¶¶ 9–12.) Plaintiff does not ignore that factual dispute. The SAC pleads the narrower and independently significant facts SBLI admits: the URL used SBLI's own exclusive Madrivo Campaign Code, the click delivered Plaintiff to SBLI's commercial site, and SBLI had created a campaign-and-click attribution architecture to identify traffic generated by its email marketers.

22. Those admitted facts make this case materially different from a stranger placing an unauthorized hyperlink to an unrelated website. A third party could not invent the fact that SBLI itself had created and exclusively assigned the campaign code to Madrivo. At minimum, the appearance of that code in the challenged click path permits the reasonable inference that the sender obtained or reused an identifier originating within the commercial campaign architecture SBLI established to acquire email traffic. Whether that use was within the precise scope of Madrivo's authorization is a discovery issue; it does not render SBLI's own creation, assignment, tracking, and economic use of the campaign architecture nonexistent.

23. For Count One, Plaintiff alleges in the alternative that SBLI is liable as the advertiser whose product was promoted in the email and because the email was transmitted through a marketing chain using an SBLI-issued campaign identifier for the economic purpose of delivering traffic to SBLI. *Hypertouch*, 192 Cal. App. 4th at 820–21; *Greenberg*, 65 Cal. App. 5th at 925–30. Plaintiff further alleges, on information and belief, that SBLI retained contractual rights typical and necessary to an advertiser-vendor relationship to define the products and offers promoted, impose compliance requirements, restrict traffic sources and geographies, approve or prohibit campaign practices, audit attribution, withhold compensation for noncompliant traffic, and terminate or suspend Madrivo's access to SBLI campaign codes. The precise provisions are uniquely within SBLI and Madrivo's possession and are one of the three narrow subjects of jurisdictional discovery identified below.

**C. <u>SBLI's Own Website Creates Independent California Contacts Supporting Counts Two and Three</u>**

24. Counts Two and Three do not depend on imputing the email sender's conduct to SBLI. They challenge SBLI's own website conduct after Plaintiff arrived at SBLI.com. The First Amended Complaint did not draw this distinction sharply enough. This SAC does.

25. SBLI chose the code, tags, scripts, cookies, pixels, advertising integrations, analytics tools, and identity-resolution services loaded by SBLI.com. A technical examination observed that third-party requests fire immediately when the page loads, before a first-time visitor has an effective opportunity to grant or deny consent. Those requests cause the visitor's browser to communicate directly with numerous third-party servers and transmit technical and behavioral information outside SBLI.

26. The observed services include at least AdRoll/NextRoll, Eyeota, OpenX, BidSwitch, LiveRamp, Tapad, PubMatic, StackAdapt, TripleLift, Magnite, Bombora, Outbrain, HubSpot, Snapchat, The Trade Desk, Xandr, Microsoft Advertising/Bing, Microsoft Clarity, LinkedIn, Index Exchange, and AdsWizz. The technical report identifies many of these entities as registered data brokers or advertising intermediaries that synchronize identifiers across platforms, build audience profiles, or geolocate users.

27. The system is not merely "third-party content" passively present on SBLI.com. The browser executes the integrations because SBLI embedded or caused them to be embedded in the website it operates. The services are loaded for SBLI's advertising, analytics, lead-attribution, conversion-measurement, audience, and customer-understanding purposes. SBLI's own Privacy Policy confirms the commercial purpose: it states that SBLI tracks how users interact with its Platform, digital advertisements, and emails; keeps track of pages visited and use of the Platform; and analyzes trends, browsing patterns, preferences, and demographics. SBLI, Online Privacy Policy, *supra*.

28. The technical examination observed several integrations that reveal or use location. Xandr receives a request through adnxs.com in which an X-Proxy-Origin response header preserves the user's originating IP address, which identifies the geographic region from which the request originated. PubMatic is described as collecting geolocation information for targeted advertising. StackAdapt is identified as a registered data broker that geolocates users and receives user tracking IDs. Magnite's integration participates in cookie syncing and ID matching and is identified as geolocating users. These facts supply the location-knowledge mechanism that the Court found absent from the prior record.

29. SBLI itself independently admits that it learns location in precisely this context. Its Privacy Policy states that when a person visits the Platform, opens SBLI emails, or interacts with SBLI digital advertisements, SBLI may learn the person's "non-precise geographic location," including by collecting the person's IP address or other device information. SBLI, Online Privacy Policy, *supra*. Thus the relevant inference does not depend solely on attributing a third party's knowledge to SBLI: SBLI represents that itself may learn the location of users from the same online interactions involved here.

30. The forensic evidence also shows persistent identification. AdRoll placed cookies with an approximately 395-day lifespan; LiveRamp used identity-sync requests and cookies designed to create a unique identifier and enrich it with behavioral attributes; Tapad placed cross-device identifiers; StackAdapt stored user tracking IDs for approximately 12 months; Magnite placed cookies allowing identification and tracking for approximately 365 days; Snapchat established a persistent cookie used for cross-site profiling; Microsoft/Bing created a MUID identifier that identifies a unique browser and can persist for a year; LinkedIn used device-identity and probabilistic-matching cookies; and Microsoft Clarity tied session recordings and behavioral analytics to Microsoft advertising identifiers.

31. Microsoft Clarity is especially significant to the intrusion claim. The examination observed Clarity collecting page views, clicks, scrolling, navigation, device and session identifiers, and sending encoded session-recording data to Microsoft while synchronizing with Microsoft advertising data. That is concrete observation of user conduct, not a generalized allegation that an IP address existed somewhere in an HTTP transaction.

## D. ***Briskin*** **Controls the Website-Tracking Jurisdictional Analysis.**

32. *Briskin* is an en banc published Ninth Circuit decision applying traditional jurisdiction principles to precisely the problem presented by modern tracking technology. Shopify argued that a California consumer's decision to interact with a merchant was unilateral happenstance and that Shopify's nationwide data practices lacked a California-specific focus. The Ninth Circuit rejected both premises. 135 F.4th at 755–60.

33. First, *Briskin* treats electronic penetration of a forum device as a real forum contact. The court analogized the defendant's alleged conduct to a person physically entering a Californian's home by deceptive means to take personal information for commercial gain. *Id.* at 756. It emphasized the Supreme Court of the United States's recognition in *Walden* v. Fiore, 571 U.S. 277, 285 (2014), that physical entry into a State through "an agent, goods, mail, or some other means" is a relevant contact and held that Shopify's electronic entry into California to intercept personal identifying information was likewise jurisdictionally relevant. *Id.* at 756–57 (quoting *Walden*, 571 U.S. at 285).

34. Second, *Briskin* makes location knowledge functional, not formalistic. The court found it sufficient that Shopify allegedly knew the location of consumers "either prior to or ***shortly after*** installing its initial tracking software" and then extracted, maintained, and commercially distributed their data. *Id.* at 756 & n.13 (emphasis added). The constitutional inquiry, therefore, does not turn on whether a defendant knew a civil name and street address ***before*** the first network request. It turns on

whether the defendant's chosen technology learns that the device is in California during the challenged interaction and continues the alleged tortious extraction or exploitation thereafter.

35. That rule maps directly to the pleaded technical sequence. SBLI's website initiates requests on page load. Those requests disclose IP information and generate or read identifiers. SBLI's policy admits that the same website, email, and digital-ad interactions may reveal non-precise location. The tracker ecosystem then continues placing cookies, synchronizing identities, recording behavior, and transmitting data. Thus, even if the very first request is the mechanism that reveals California, the continuing conduct after that revelation is purposeful forum activity under *Briskin*.

36. Third, *Briskin* expressly abolished the "forum-specific focus" or "differential targeting" rule. The Ninth Circuit held that *AMA Multimedia* had misread *Mavrix Photo* and overruled *AMA* and "any other cases" requiring some form of differential targeting or treatment of the forum state. (135 F.4th at 757–58.) A nationwide interactive business does not become jurisdictionally nowhere merely because it treats consumers in all fifty states the same. (*Id.* at 758.) The correct question is whether the forum contacts were the defendant's own choice and not random, isolated, or fortuitous. (*Id.*)

37. That holding matters because SBLI's anticipated argument—that SBLI.com uses the same tracking stack nationwide—proves too little. If SBLI deliberately operates an interactive commercial website nationwide, deliberately serves California as a licensed market, deliberately configures technologies to obtain location and device information, and continues extracting and exploiting data once those systems identify a California device, the absence of a special California-only pixel is not exculpatory. It is the exact differential-targeting defense *Briskin* rejected.

38. Fourth, *Briskin* reaffirmed *Mavrix Photo*'s focus on the interactivity of the website, the geographic scope of the defendant's commercial ambitions, and exploitation of a forum audience for commercial gain. (135 F.4th at 757–58.) SBLI's

website is highly interactive; it solicits quotes and applications, collects ZIP codes and contact information, deploys marketing and attribution technology, and is operated by an insurer licensed to sell life and disability insurance in California. California is, therefore, part of the geographic scope of SBLI's chosen market, not a happenstance location in which a traveling consumer happened to open a static webpage.

39. Fifth, *Briskin* explains why *Walden* does not save SBLI. *Walden* lacked jurisdiction because no part of the defendant's challenged course of conduct occurred in Nevada and the plaintiffs' Nevada residence was the only connection to the forum. *Briskin*, 135 F.4th at 758–59. Here, by contrast, the challenged electronic conduct itself occurred in part on a device physically located in California, and SBLI's systems learned location information during that interaction. Plaintiff's residence is not the only forum link; the alleged electronic entry, tracking, identification, recording, and data transmission occurred through a California device.

40. Sixth, the claims arise out of or relate to those California contacts. Count Two challenges the capture of routing, addressing, and signaling information by the very processes SBLI caused to execute on Plaintiff's California device. Count Three challenges the covert observation, persistence, identity resolution, and behavioral recording accomplished through those same processes. The forum contacts and the alleged injuries are not merely correlated; they are the same events viewed through jurisdictional and substantive lenses. (*See Briskin*, 135 F.4th at 759–60; *Ford Motor Co.*, 592 U.S. at 362–65.)

41. Finally, exercising jurisdiction is reasonable. SBLI has held a California certificate of authority for approximately two decades, designated a California agent for service, built California-specific privacy compliance into its website, and deliberately serves California consumers. California has an acute sovereign interest in regulating alleged privacy invasions occurring on devices physically located here and in enforcing California's anti-spam statute for commercial email sent to California addresses. SBLI

cannot plausibly claim to be surprised at being called to answer in California for claim-linked conduct occurring in a market it has chosen to enter and regulate itself to serve.

### E. The Three Narrow Subjects of Jurisdictional Discovery, If the Court Determines More Evidence Is Needed

42. Plaintiff submits that the foregoing allegations and judicially noticeable evidence independently establish a prima facie basis for specific jurisdiction. If the Court determines that additional proof is necessary, Plaintiff requests jurisdictional discovery limited to only three subjects, each tied directly to a finding in the September 10 Order and each capable of confirming or disproving a discrete jurisdictional fact.

(1) SBLI–Madrivo control and authorization. The operative SBLI–Madrivo agreement(s), campaign terms, compliance directives, and communications sufficient to show SBLI's contractual right, if any, to control or restrict email content, sending domains, subpublishers, traffic sources, geographic targeting or exclusions (including California), approval processes, compliance standards, audit rights, payment withholding, suspension, and termination for the campaign associated with the SBLI Campaign Code appearing in Plaintiff's URL. This directly addresses the Court's finding that the prior record did not establish the principal's "right of control."

(2) Campaign attribution and California traffic. Records sufficient to identify the SBLI Campaign Code in Plaintiff's URL, the entity or account to which it was assigned, the disputed Click-Key or any related redirect/click identifiers, the date/time and destination of Plaintiff's click, any IP or geolocation data associated with that click, California traffic generated through that campaign, and compensation or attribution credited to SBLI's marketing partners for campaign traffic. This directly addresses whether the email-to-SBLI pathway was defendant-created rather than random or fortuitous.

(3) SBLI.com location knowledge and tracker execution. Technical configuration and logs sufficient to show, for the relevant time period, when

SBLI.com or its integrated services obtained Plaintiff's IP-derived location relative to the firing of third-party tracking code, what location/device/identifier fields SBLI received or made available to its advertising and analytics partners, and whether the identified integrations were selected, configured, or used by SBLI for advertising, analytics, attribution, audience, or session-recording purposes. This directly addresses *Briskin*'s location-knowledge rule and the Court's prior finding that Plaintiff had not adduced evidence that SBLI knew the harm would occur in California.

43. These requests are not a fishing expedition. They are anchored to admitted facts: SBLI has identified Madrivo as its email-marketing service; SBLI admits it assigned Madrivo the exclusive Campaign Code found in Plaintiff's URL; SBLI admits it maintains an email-marketing tracking system; SBLI's own public policy admits collection of IP-derived location from website, email, and digital-ad interactions; and the technical report documents geolocation and tracking requests actually executing on SBLI.com. The requested discovery is, therefore, targeted to existing systems and relationships SBLI itself has identified.

## III. <u>FACTUAL ALLEGATIONS</u>

### A. <u>The Commercial Email Advertisement</u>

44. On March 16, 2026, while physically located in California, Plaintiff received at her California email address an unsolicited commercial email advertising SBLI term-life insurance. The email identified itself as associated with SBLI, displayed SBLI branding, promoted term-life insurance, and included a "Check My Rate Now" call-to-action leading to SBLI.com. A true and correct image of the email is attached as Exhibit A.

45. Plaintiff had no preexisting business relationship with SBLI and had not given direct consent to receive commercial email advertisements from SBLI or its marketing agents.

46. The email's visible sender information was "SBLI_AssociatE" at an address using the domain bt.beautyhelp.net. The sender domain does not identify SBLI or Madrivo and is disconnected from the insurance product being advertised. The email also used routing and tracking mechanisms that obscured the commercial path while embedding the SBLI Campaign Code described above.

47. Plaintiff alleges that the header information was falsified, misrepresented, or materially misleading within the meaning of Business and Professions Code section 17529.5(a)(2), including because the visible sender identity did not truthfully and traceably identify the entity that actually transmitted or controlled the commercial email. *See Greenberg*, 65 Cal. App. 5th at 925–30; *Balsam v. Trancos, Inc.*, 203 Cal. App. 4th 1083, 1101–04 (2012). Plaintiff further alleges on information and belief that discovery will establish whether the third-party domain was used with permission and, if not, that section 17529.5(a)(1) independently applies.

48. The email's subject line, "Protect Your Family's Tomorrow, Today," was also likely to mislead a reasonable recipient about a material fact concerning the message. It conveyed urgency and present protection even though the advertised insurance required an application, underwriting or eligibility review as applicable, policy issuance, and payment before coverage existed. Plaintiff alleges that the subject line was designed to induce opening and engagement by implying an immediacy materially different from the actual transaction.

49. But for the misleading sender information and subject-line presentation, Plaintiff would not have opened the email or followed the call-to-action. The deceptive email therefore accomplished its commercial objective: it caused Plaintiff to enter the performance-marketing funnel and arrive at SBLI.com.

**B. <u>The SBLI Campaign Code and Attribution Architecture</u>**

50. The destination URL from the email contained an SBLI Campaign Code that SBLI admits it had exclusively assigned to Madrivo for Madrivo's sole use in SBLI marketing emails. (Pennelli Decl. ¶¶ 3–5.) The presence of that code is objective

evidence that the URL was built to participate in SBLI's marketing-attribution architecture.

51. The URL also contained a Click-Key. SBLI asserts after an internal investigation that the particular Click-Key was not found in SBLI's system and was not associated with Madrivo. (*Id.* ¶¶ 7–12.) Plaintiff does not plead that assertion away. Instead, Plaintiff alleges that the mismatch creates a factual issue as to how an SBLI-issued exclusive Campaign Code was incorporated into a click path that successfully delivered a California consumer to SBLI's website and whether a downstream publisher, subpublisher, affiliate, unauthorized actor, or other participant reused or manipulated campaign identifiers within the SBLI/Madrivo ecosystem.

52. SBLI is uniquely positioned to identify the full redirect chain, campaign-account ownership, publisher/subpublisher hierarchy, payment rules, suppression and compliance requirements, and traffic reports associated with the Campaign Code. Those records are also relevant to whether SBLI exercised or possessed a contractual right of control over marketing methods and whether SBLI financially benefited from traffic generated using its campaign identifiers.

**C. <u>SBLI.com Immediately Initiated Third-Party Tracking Before Effective Consent</u>**

53. After Plaintiff clicked the email and arrived at SBLI.com from California, the website immediately caused her browser to retrieve and execute third-party advertising and analytics resources. The technical examination found that these requests occurred before the visitor was given an effective opportunity to grant or deny consent through the site's cookie or privacy controls.

54. The third-party stack observed on SBLI.com is unusually extensive. It included advertising exchanges, demand- and supply-side platforms, registered data brokers, identity-resolution firms, audience-building tools, social-media pixels, marketing automation, and session-recording technology. The economic purpose is not merely to render a webpage; it is to identify the visitor, attribute the visit, measure

advertising performance, create or enrich audience profiles, synchronize identifiers across companies, retarget the user, and analyze behavior.

55. AdRoll/NextRoll received tracking requests, synchronized data with third-party platforms, and placed cookies lasting approximately 395 days. Eyeota used identity-resolution and fingerprinting techniques for targeted marketing. OpenX synchronized user data with third-party advertising platforms and tracked visitor IP information. BidSwitch transmitted external user IDs for synchronization across advertising platforms. LiveRamp synchronized identifiers with third-party partners and used persistent cookies to link browsing behavior and audience attributes to a unique identifier.

56. Tapad placed identifiers designed for cross-device identity resolution. PubMatic collected online identifiers, browser/device data, behavioral information, and geolocation information for targeted advertising . StackAdapt received user tracking IDs and placed tracking cookies with approximately 12-month persistence. TripleLift tracked users for targeted advertising. Magnite synchronized cookies and identifiers across the advertising ecosystem and placed persistent tracking cookies. Bombora tracked content consumption and engagement for profile-based advertising. Outbrain tracked website activity for interest-based advertising. HubSpot tracked visitor activity, IP addresses, and other online identifiers for sales and marketing purposes.

57. Snapchat's pixel transmitted behavioral and device-level identifiers, including unique visitor, session and correlation IDs, device attributes, referrer and timing information, page views, and interaction data, and established a persistent sc_at cookie associated with cross-site profiling. The Trade Desk received requests used to identify users and track their behavior for audience-building and targeted advertising. LinkedIn received tracking requests and device-identity cookies to synchronize visitor data with advertising audiences. Index Exchange received tracking identifiers used in programmatic advertising. AdsWizz assigned device-level identifiers for ad exposure and interaction profiling.

58. Xandr is particularly relevant to location. The examination observed a request to Xandr's adnxs.com tracking endpoint and an X-Proxy-Origin header preserving the originating device's IP address. That header exists to preserve the client IP through proxy layers and reveals the geographic region from which the request originated. Thus, the visit generated a technical signal identifying California during the challenged tracking sequence.

59. Microsoft/Bing created or read a persistent MUID (Machine Unique Identifier), used to identify a unique browser across sites and sessions. Microsoft can associate such pseudonymous activity with a user account when the user is logged in or later signs in. Microsoft Clarity used session identifiers and advertising identifiers while recording behavioral data including page views, clicks, scrolling, navigation, heatmap/session information, and device/session attributes.

60. These technologies collectively permit persistent recognition and correlation. A consumer who arrives at SBLI.com can be assigned or matched to identifiers that persist far beyond that single visit and can be synchronized with advertising partners and data brokers operating across other websites and devices. The resulting intrusion is qualitatively different from ordinary transient network routing necessary to deliver a webpage.

## D. SBLI Knows and Uses Location and Interaction Data

61. SBLI's own Privacy Policy confirms that these observed technical functions are consistent with SBLI's declared data practices. SBLI states that when a consumer visits its Platform or interacts with its emails or digital advertisements, SBLI may collect the browser/device type and settings, IP address, unique online identifiers, referring and exit pages, and date and time of interaction. SBLI, Online Privacy Policy, *supra*.

62. SBLI further states that it collects Usage Data concerning pages visited, links or buttons clicked, search terms, and similar interactions with the Platform, emails, and digital advertisements, and that when a consumer visits its Platform, opens its

emails, or interacts with its digital advertisements, SBLI may learn the consumer's non-precise geographic location by collecting the IP address or other device information. (*Id.*)

63. SBLI states that it uses personal information to analyze activity while visiting the Platform and interacting with emails and digital advertisements, keeps track of pages visited and use of the Platform, and analyzes browsing patterns, preferences, and demographics. (*Id.*) Those admissions support the reasonable inference that location and interaction information are not accidental exhaust from a network connection; they are data categories SBLI deliberately collects and uses for defined business purposes.

64. Plaintiff was physically in California throughout the relevant visit. Her IP address and other network signals therefore identified a California-originating interaction. SBLI's own policy says SBLI may learn location through precisely those signals, and the technical examination shows integrated advertising services actually processing IP/location information and persistent identifiers during the visit. SBLI thus knew or, through its deliberately configured systems, learned during the challenged interaction that it was electronically interacting with a California device.

## E. <u>Concrete Privacy and Resource Injuries</u>

65. Plaintiff did not consent before the challenged tracking commenced. The tracking code executed before an effective opportunity to deny the third-party data collection. Plaintiff was unaware that her visit would cause her browser to communicate with a wide network of data brokers and advertising platforms, place long-lived identifiers on her device, synchronize those identifiers with external profiles, and record detailed session behavior.

66. The challenged conduct invaded Plaintiff's interest in the private use of her device and browser and in controlling the disclosure of her online behavior. It also caused unauthorized third-party communications, cookie storage, processing, and bandwidth consumption on her device. The injury is concrete because the alleged

invasion closely resembles historically actionable intrusion upon seclusion and because Plaintiff's device and browsing behavior were actually subjected to observation and persistent identification, not merely placed at a speculative risk of future disclosure.

67. For the email claim, Plaintiff also suffered concrete time-and-attention injury in opening and investigating a deceptive commercial solicitation and suffered unwanted consumption of device/network resources associated with transmission, rendering, tracking pixels, and redirects. The statutory claim additionally vindicates California's substantive right not to be subjected to commercial email advertisements containing the prohibited deceptive features enumerated in section 17529.5.

## IV. CLASS ACTION ALLEGATIONS

68. Plaintiff brings this action under Federal Rule of Civil Procedure 23 on behalf of herself and all others similarly situated.

69. The proposed Spam Class consists of: All natural persons with California electronic mail addresses who, during the applicable limitations period, received one or more unsolicited commercial email advertisements advertising SBLI products or services where the email contained materially falsified, misrepresented, or forged header information, a third-party domain used without permission, or a subject line that the advertiser knew would likely mislead a reasonable recipient about a material fact.

70. The proposed Website Interception Class consists of: All natural persons who, while physically located in California during the applicable limitations period, visited SBLI.com and, before providing valid consent to the challenged third-party tracking, had the contents or meaning of one or more browser communications contemporaneously acquired, read, learned, received, or transmitted to an independent third party through scripts, pixels, beacons, cookies, analytics, advertising, identity-resolution, or session-recording technologies deployed on SBLI.com.

71. Excluded are SBLI's officers, directors, and employees; counsel for the parties; the Court and Court staff assigned to this action; and persons who validly agreed to an enforceable release specifically encompassing the claims asserted here.

72. Numerosity is satisfied because SBLI's digital marketing and website traffic involve thousands of consumers, and the exact number can be determined from campaign, web, analytics, cookie-consent, and advertising-platform records.

73. Common questions predominate, including whether SBLI advertised through standardized email campaign infrastructure; whether challenged emails used misleading header or subject information; whether SBLI.com deployed the identified tracking technologies before effective consent; what page, URL, referrer, navigation, click, scroll, session, event, device, identifier, and behavioral information those processes contemporaneously transmitted to independent third parties; whether that information constitutes the contents or meaning of communications under California Penal Code section 631(a); whether SBLI intentionally aided or enabled the third-party acquisition; whether the conduct would be highly offensive to a reasonable person; and whether SBLI's standardized conduct caused legally cognizable injury.

74. Plaintiff's claims are typical because she received the challenged form of SBLI advertising and experienced the standardized website tracking generated by the same code and third-party integrations used for other California visitors.

75. Plaintiff will fairly and adequately protect the classes and has retained counsel experienced in complex consumer class actions. A class action is superior because individual damages are comparatively modest, the challenged conduct is standardized, and classwide adjudication will avoid inconsistent rulings and duplicated discovery into the same campaign and tracking systems.

## V. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of California Business and Professions Code § 17529.5

76. Plaintiff incorporates the preceding allegations.

77. Section 17529.5 makes it unlawful for any person or entity to advertise in a commercial email advertisement sent to a California electronic mail address when the advertisement contains or is accompanied by a third party's domain name without

permission, contains falsified, misrepresented, or forged header information, or has a subject line the advertiser knows would likely mislead a reasonable recipient about a material fact concerning the message. (Cal. Bus. & Prof. Code § 17529.5(a)(1)–(3).)

78. SBLI advertised its life-insurance products in the challenged commercial email. Liability under section 17529.5 is not limited to the person who physically presses "send." *Hypertouch*, 192 Cal. App. 4th at 820–21; *Greenberg*, 65 Cal. App. 5th at 925–30.

79. The challenged email contained materially misleading header information because the visible sender identity and domain did not truthfully identify or make readily traceable the actual commercial sender while the body advertised SBLI. Plaintiff further alleges on information and belief that discovery will establish whether the third-party domain was used without permission. The subject line was independently likely to mislead a reasonable recipient about the immediacy and certainty of the advertised protection.

80. The email was unsolicited and delivered to Plaintiff's California email address. SBLI's own Campaign Code appeared in the click path, and the email delivered Plaintiff to SBLI.com for SBLI's commercial benefit.

81. Plaintiff and members of the Spam Class are entitled to the remedies authorized by section 17529.5, including liquidated damages, actual damages where proven, and attorneys' fees and costs, subject to the statutory limitations and defenses.

## <u>SECOND CLAIM FOR RELIEF</u>

### Violation of California Penal Code § 631(a) (Unauthorized Interception)

82. Plaintiff incorporates the preceding allegations.

83. California Penal Code section 631(a) prohibits, among other things, intentionally making an unauthorized connection with a wire, line, cable, or instrument; willfully and without consent reading, attempting to read, or learning the contents or meaning of a communication while it is in transit or passing over a wire, line, or cable; and aiding, agreeing with, employing, or conspiring with another person to accomplish

such an interception. (Cal. Penal Code § 631(a).) California Penal Code section 637.2 supplies a civil remedy, including statutory damages, for violations of section 631.

84. The challenged conduct is not merely SBLI's first-party receipt of a browser request directed to SBLI.com. SBLI selected, embedded, maintained, and commercially used third-party scripts, pixels, beacons, cookies, advertising tags, identity-resolution tools, and session-recording code that caused Plaintiff's browser, while communicating with and rendering SBLI.com, to make additional contemporaneous communications to independent third parties including advertising exchanges, data brokers, identity-resolution services, social-media advertising platforms, and Microsoft Clarity. Those third parties were not the intended recipients of Plaintiff's communications with SBLI.

85. Those independent third parties acquired the contents or meaning of Plaintiff's communications while the communications were in transit, not merely from a stored historical record after the communication ended. The technical examination shows code executing at page load and during the live browsing session and transmitting, among other things, the page or destination being viewed, referrer information, page-view events, clicks, scrolling and navigation behavior, timestamps, session and correlation identifiers, device/browser context, advertising identifiers, and other event-level information revealing what Plaintiff was viewing and doing on SBLI.com. Microsoft Clarity, for example, recorded page views, clicks, scrolling, navigation, and heatmap/session data and transmitted encoded session-recording data while synchronizing the activity with Microsoft advertising identifiers. Snapchat received page-view and interaction information together with referrer, timing, device, visitor, session, and correlation identifiers. LinkedIn, The Trade Desk, HubSpot, Outbrain, LiveRamp, AdRoll, and other integrations likewise received live visit and event information for advertising, analytics, identity resolution, attribution, or audience-building purposes.

86. The acquired information constitutes the "contents or meaning" of electronic communications because it reveals the substance and context of Plaintiff's live interaction with an insurance website: the requested page or destination, the page from which the request originated, the sequence and timing of page views, the actions taken on the page, and behavioral events reflecting how Plaintiff engaged with SBLI's life-insurance content. The section 631(a) claim therefore does not rest on a bare IP address or other non-content routing datum. IP address, device identifiers, and persistent cookies are pleaded as contextual and linking information showing how the independent third parties associated the content-bearing communications with a persistent browser or advertising profile; the intercepted contents themselves include page, referrer, navigation, click, scroll, page-view, session, and event information.

87. The interception was contemporaneous. SBLI's code caused the browser to duplicate and transmit the content-bearing information to third-party endpoints as Plaintiff's communications with SBLI.com occurred and as the website rendered and responded to her actions. The third parties did not merely obtain a later report generated from SBLI's stored records. *See Javier v. Assurance IQ, LLC*, 96 F.4th 1198, 1202–03 (9th Cir. 2024) (consent to interception must precede the interception).

88. Plaintiff did not give prior, informed consent to these independent third parties acquiring the contents or meaning of her SBLI.com communications. The technical examination found that third-party requests began immediately when the page loaded, before the visitor was given an effective opportunity to grant or deny consent through SBLI's cookie or privacy controls. Later notice cannot retroactively authorize an interception that has already occurred. *Javier*, 96 F.4th at 1202–03.

89. SBLI acted intentionally and, at minimum, aided and enabled the interceptions. The third-party connections did not arise spontaneously from Plaintiff's browser. They occurred because SBLI chose and embedded the relevant code in SBLI.com, caused that code to execute, provided the third parties access to the resulting communications, and used the resulting advertising, attribution, analytics, identity-

resolution, audience, and session-recording functionality for SBLI's commercial purposes. To the extent SBLI contends it is itself a party to Plaintiff's intended browser communications, that contention does not immunize independent third parties that contemporaneously acquired the communications for their own advertising, data-broker, analytics, identity-resolution, or platform purposes, and it does not eliminate SBLI's liability under section 631(a)'s separate aiding-and-assisting clause for intentionally enabling those acquisitions.

90. The California Court of Appeal's August 21, 2026 tentative ruling in *Variety Media, LLC v. Superior Court*, No. B350578, Tentative Ruling at 1–3 (Cal. Ct. App. Aug. 21, 2026), does not undermine this claim. *Variety* concerns the distinct statutory definitions governing section 638.51 and the directional character of non-content metadata captured by a pen register or trap-and-trace process. The tentative does not adjudicate section 631(a), which separately protects the contents or meaning of communications against contemporaneous third-party interception and separately imposes liability on persons who aid or enable such interception. Plaintiff has therefore withdrawn the section 638.51 theory and pleads section 631(a) based on the content-bearing, contemporaneous third-party transmissions documented on SBLI.com.

91. Plaintiff suffered a concrete privacy injury from the unauthorized contemporaneous disclosure and acquisition of her live insurance-related website communications by independent third parties, together with loss of control over those communications, unwanted use of her device and network resources, and persistent association of the intercepted activity with third-party identifiers. Plaintiff and members of the Website Interception Class seek statutory damages and all other relief authorized by California Penal Code section 637.2.

**<u>THIRD CLAIM FOR RELIEF</u>**

**Intrusion Upon Seclusion**

92. Plaintiff incorporates the preceding allegations.

93. SBLI intentionally intruded into Plaintiff's private use of her device, browser, and online activity by causing a large network of third-party advertising, data-broker, identity-resolution, and session-recording processes to execute without effective prior consent and to collect, transmit, synchronize, retain, and use information about her device, location, browsing, interactions, and behavioral session.

94. Plaintiff had a reasonable expectation that visiting an insurer's website to investigate a life-insurance advertisement would not, before consent, cause a broad network of unrelated advertising intermediaries and data brokers to place long-lived identifiers, synchronize her browser with external profiles, geolocate her, and record detailed behavior. That expectation is especially substantial in the context of an insurance website, where consumers may reasonably anticipate that browsing and quote behavior can reveal sensitive financial, family, health, age, or mortality-related interests even before an application is submitted.

95. The intrusion would be highly offensive to a reasonable person. The challenged conduct was covert; began before effective consent; involved persistent identifiers with lifespans measured in months or more than a year; included cross-site and cross-device identity resolution; involved entities whose business models include targeted advertising and data brokerage; and included session-recording technology capable of reconstructing clicks, scrolls, page views, and navigation behavior.

96. The offensiveness is heightened by the scale of the disclosure. Plaintiff's browser did not communicate with a single service necessary to render the SBLI page. It communicated with numerous advertising and tracking entities, including registered data brokers and large advertising exchanges, permitting information generated by a single insurance-related visit to be correlated across the broader advertising ecosystem.

97. SBLI's intrusion caused actual injury to Plaintiff's privacy, autonomy, and use of her device and proximately caused the unauthorized disclosure and processing of her information. Plaintiff seeks compensatory, nominal, and punitive damages as permitted by law and appropriate injunctive and declaratory relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a. An order certifying the proposed classes, appointing Plaintiff as class representative, and appointing undersigned counsel as class counsel;

b. A declaration that the challenged conduct violates California Business and Professions Code section 17529.5 and California Penal Code section 631(a) and constitutes intrusion upon seclusion;

c. Statutory and liquidated damages as authorized by law;

d. Actual, compensatory, nominal, and punitive damages as authorized by law;

e. Appropriate injunctive relief requiring SBLI to cease unlawful email-advertising practices and nonconsensual third-party tracking and to implement lawful consent and data-handling controls;

f. Prejudgment and postjudgment interest as allowed by law;

g. Attorneys' fees and costs as authorized by statute or other law; and

h. Such other and further relief as the Court deems just and proper.

Dated: October 1, 2026

PACIFIC TRIAL ATTORNEYS, APC

By: */s/ Scott J. Ferrell*
Scott J. Ferrell
Attorneys for Plaintiff and the Proposed Classes

# EXHIBIT A

**From:** "SBLI_AssociatE" customerservice@bt.beautyhelp.net
**To:** "biancamua28@yahoo.com" <biancamua28@yahoo.com>
**Sent:** Monday, March 16, 2026 at 02:08:34 AM PDT
**Subject:** P r o t e c t Y o u r F a m i l y ' s T o m or r o w , T o d a y

